CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY v.
WEBB (1)

AND

CHERRY v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY
COMPANY (2).

Opinion delivered May 25, 1925.

MASTER AND SERVANT—PENALTY FOR NONPAYMENT OF WAGES.—
In an action to recover from a railroad company the penalty for
nonpayment of wages of discharged employees, evidence *held* to
sustain a finding that the plaintiffs had complied with Craw-
ford & Moses' Digest, § 7125, and that the company had failed to
pay their wages at the time and place required.

Appeals from Hot Spring Court; *Thomas E. Toler*,
Judge; No. 1 affirmed; No. 2 reversed.

*Thos. S. Buzbee* and *Geo. B. Pugh*, for Railroad Co.
*A. I. Roland* and *D. D. Glover*, for plaintiffs.

WOOD, J. W. O. Webb and J. C. Cherry were
employed by the Chicago, Rock Island & Pacific Railway
Company, hereafter called company, to watch and coal
its engines at night while in its yards at the town of
Malvern. They instituted independent actions against
the company, under § 7125 of Crawford & Moses' Digest,
to recover the penalty for nonpayment of wages, alleg-
ing that they had been discharged; that they had com-
plied with the statute, and that the appellant had refused
to pay their wages. The appellant answered and denied
liability. The causes were consolidated for trial.

Webb testified that he was nineteen years old. He
went to work for the company August 27, 1923. His
duty was to watch and coal engines at night so as to
have them ready for the next day. He was to receive
$3 per night. He worked five nights. His foreman was
named Ledford. Ledford employed him and discharged
him. He was discharged September 1, 1923. When wit-
ness was discharged by Ledford, witness asked him when
he could get his money, saying that he would like to have
it right then. Ledford replied, "You will get it in a day
or two. Just send a card in for your time." Ledford
said he didn't have anything to write witness' time on;

that they attended to that in Little Rock, and would send it to the office at Malvern. Witness requested Ledford to have it sent to Malvern. Witness made out a card every morning for the night before, and made out such a card on the morning of September 1. He put it in the baggage coach and sent it to Butterfield and then to Little Rock. Witness put the card where Ledford told him to put it. For sixteen days thereafter, witness went to the office at Malvern and asked the agent if the check had come for his money, and the agent told him that it hadn't come. Witness then went to the passenger depot and wired for his pay, and still it didn't come. It was finally sent to Mr. Glover, witness' attorney. Witness worked some overtime, and that was the reason why the check was sent for $17 instead of $15. Witness had turned in his time for $15 when he brought the suit. Witness signed the card "Owen Webb," and they made out the check to "Wiff" instead of "Webb."

Cherry testified that he was employed by the company in the same capacity as Webb. He was discharged on September 3 by Ledford. When he was discharged he demanded his time of Mr. McColpin, the foreman on the job, and was told that he would have to go to the time office at Little Rock. He was told to report to the freight depot to Mr. Johnson, and he would get his money from him in two or three days. Witness made out his own time card each morning and took it to the foreman, who was the engineer on the passenger train. The foreman O.K.'d it. Witness put these time cards in the baggage coach in the mail department, where witness was instructed to put them. The foreman told witness that witness would collect for his time over at the freight depot, where Johnson was the agent. Witness went to the freight depot every morning to try to collect the amount due him, until the 16th of September. He then went to the passenger depot and wired to the time-keeper in Little Rock for a check. Johnson was the agent of the company at the freight depot, and Jones was the time-keeper and cashier. Witness sent the wire to Little

Rock for his pay addressed ''Time-Keeper, Rock Island.''
He didn't know the name of the time-keeper.

Ledford testified that he was not the time-keeper of
Webb and Cherry; that he was looking after the engines
and keeping the boilers from being blown up, as these
boys were inexperienced. He was telling them how to do
their work. He didn't hire either of them. Neither of
the boys asked him to get a time-check for them. Webb
asked witness about getting his pay, and witness told
him to go to McColpin, who was taking care of that.
Witness understood that McColpin had O.K.'d their time
cards. He signed their cards for them.

McColpin testified that he was in the employ of the
company as a locomotive engineer. He had nothing to
do with employing Webb, other than to tell Cherry that,
if he had an extra engine, he could pick up somebody to
help him out. Witness remembered the time that Cherry
and Webb quit work. Witness O.K.'d the time cards of
Webb and Cherry in order to identify the parties. It
was what was called their work cards. Witness told
Webb and Cherry to mail these cards to the master
mechanic at Little Rock. Webb came around one morn-
ing and asked witness what to do to get his time, and
witness told him to take it up with the agent and the
agent would wire for his time, or something to that effect.
Witness didn't undertake to get the time for Webb him-
self. The engine watching was done under witness'
supervision. Time would not be recognized unless wit-
ness O.K.'d the cards. There was a place on the train
for receiving railroad mail. Witness told the boys where
to put their cards. These cards, if made out properly,
would go to the master mechanic's office at Little Rock.
Then it would be the master mechanic's duty to see that
the checks were issued. The parties were furnished
envelopes by the company which they used to mail these
cards. All of the men working there watching these
engines would come to witness to O. K. their cards.
Cherry and Webb did just like the others had done.

Johnson testified that he was the agent of the com-
pany at Malvern in September, 1923. He remembered

Cherry and Webb asking the cashier, Jones, about their time checks. They never did come to witness. The pay checks usually came to witness' office on the 14th, 30th or 31st of the month—at the middle and end of each month. "Pay checks—we just handed out to the party they are made payable to, and the time checks—we take their signatures on the time checks and pay them the cash right there in the office. In order to get a time check, we have to have an identification to correspond to their check."

Jones testified that he was in the employ of the company in August and September, 1923. He was cashier at Malvern. He knew Webb and Cherry. He denied that they asked him to get any time checks for them, and denied that they made any demand on him for pay for the work they had done. They did ask witness for checks which they were expecting. The checks were not there when they called for them. The regular pay checks usually came a day ahead of the 15th and a day ahead of the last of each month. These parties came to witness four mornings in succession asking about their checks, and witness suggested that they send a telegram. Witness didn't have anything to do with keeping their time down there. Webb seemed to be looking for a time check, and there was no time check for him. After these pay checks came, witness tried to locate the parties, but could not do so. Witness kept the checks until the 18th of October, and did not mail it to Webb. Neither did he write Webb or Cherry that the checks were there for them.

The jury returned a verdict in favor of Webb to cover penalty only in the sum of $180, and in favor of the company against Cherry. Judgments were rendered in accordance with the verdicts, from which are these appeals.

Section 7125 of Crawford & Moses' Digest provides: "Whenever any railroad company or corporation, or any receiver operating any railroad engaged in the business of operating or constructing any railroad or railroad bridge, shall discharge, with or without cause, or refuse

to further employ any servant or employee thereof, the unpaid wages of any such servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of such discharge or refusal to longer employ; any such servant or employee may request of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station where a regular agent is kept, and, if the money aforesaid, or a valid check therefor, does not reach such station within seven days from the date it is so requested, then, as a penalty for such nonpayment, the wages of such servant or employee shall continue from the date of the discharge or refusal to further employ at the same rate until paid. Provided, such wages shall not continue more than sixty days, unless an action therefor shall be commenced within that time. Provided, further, that this act shall apply to all companies and corporations doing business in this State, and to all servants and employees thereof, and any such servants or employees who shall hereafter be discharged or refused further employment may request or demand the payment of any wages due, and, if not paid within seven days from such discharge or refusal to longer employ, then the penalties hereinbefore provided for railway employees shall attach."

The undisputed testimony of Webb and Cherry showed that they were employed by the company, and that they were discharged, and their testimony, as well as the testimony of McColpin, shows that they applied to McColpin, who was their foreman and the keeper of their time. He O.K.'d their time cards for their pay at the time they were discharged, and directed them whom to mail their time cards to at Little Rock, which was done in envelopes furnished by the company, so that they would go to the master mechanic's office in Little Rock, where the record was kept. McColpin further testified that he told Cherry, when he came to witness to get the money for his labor, that he should go to the agent; that Webb might have been present when Cherry was making

the inquiry. The undisputed testimony shows that both Webb and Cherry went to the freight agent at Malvern, where they were told to go and where they were assured their money would be sent in two or three days; that the pay checks were usually sent to the freight office. Webb and Cherry went to the freight depot, as their undisputed testimony shows, each day for sixteen days. after they had been discharged, and demanded their pay, and they were not paid even the wages that were due them until after the institution of their actions against the company. Webb was discharged on the first of September and Cherry on the third. The actions were instituted on the 21st of December, 1923, more than sixty days after their discharge.

The court, in its instructions, correctly declared the law as set forth in the above statute, and, at the request of the company, told the jury that, before the plaintiffs could recover, the burden was upon them to show by a preponderance of the testimony that they had complied with the provisions of the statute, first, by showing that they had been discharged or refused further employment; second, that they had requested their foreman or keeper of their time to have the money due them, or a valid check therefor, sent to the station at Malvern; and third, that the checks failed to arrive at Malvern within seven days from the time they requested same to be sent.

The court also instructed the jury that, under the undisputed testimony, no penalty could accrue for more than sixty days, as the suits had not been brought until after sixty days of the date of their discharge. The issue was thus submitted to the jury as to whether or not Webb and Cherry were entitled to recover any penalty under the statute. This was more favorable to the company than it was entitled to, for, as before stated, the undisputed testimony showed that Webb and Cherry had complied with the statute and the company had failed to pay them their wages at the time and place required by the statute, and thereby subjected itself to the penalty prescribed therein.

It could serve no useful purpose to set out in detail the instructions. Suffice it to say we have examined same and find that they correctly declare the law applicable to the facts.

The appellant company relies upon the cases of *Bush* v. *Coleman*, 131 Ark. 379; *Hall* v. *C. R. I.. & P. Ry. Co.*, 96 Ark. 634; *St. L. I. M. & S. Ry. Co.* v. *McClerkin*, 88 Ark. 277; and *St. L. I. M. & So. Ry. Co.* v. *Bailey*, 87 Ark. 132. These cases are all differentiated from the case at bar by the facts. Applying the law as therein announced to the undisputed facts of this record, it is clear that both Webb and Cherry are entitled to recover. The judgment in favor of the appellee Webb is sustained by the testimony, and will therefore be affirmed. The judgment in favor of the company against Cherry is contrary to the undisputed evidence, and it is therefore reversed, and judgment will be entered here in his favor against the company in the sum of $180, with interest at the rate of six per cent. per annum from January 31, 1924.